## David Preston et al.
### v.
## Jesse Spaulding et al.

1. CHANCERY JURISDICTION.—Where a firm by their general assignment created a trust in favor of their creditors, and one of the beneficiaries, after the neglect and refusal of the trustee to institute proper proceedings for the protection of the trust property, brought bill in equity for that purpose. *Held*, that equity has jurisdiction in a case of this character.

2. VOLUNTARY ASSIGNMENT—JURISDICTION.—In cases of voluntary assignments the county court has exclusive jurisdiction to control, administer upon and distribute the trust estate as well as to control the assignee in the performance of the duties of his trust.

3. SAME.—The assignee, however, in his efforts to get the trust fund into his possession and to subject it to the administrative jurisdiction of the county court, is not necessarily confined to suits and proceedings in that court.

4. CONTRACT—RIGHT TO RESCIND.—The court is of opinion that under the circumstances of this case, even if appellee originally had a right to rescind the contract of May 1, 1882, for the sale of lumber, such right, at least as against creditors, was lost by his negligence in failing to acquaint himself seasonably with the facts in relation to his vendee's indebtedness.

5. SAME.—But as to the lumber delivered in October, since the vendees were fully aware that they were insolvent and could have no expectation of paying for said lumber, and formed the plan of getting the lumber into their possession with a preconceived intention of not paying for it but of cheating appellee out of it, appellee has a clear right of rescission.

6. ASSIGNMENT—EXECUTION OF WARRANTS OF ATTORNEY TO CREDITORS.—Where a firm, just before making an assignment, executed warrants of attorney to confess judgment to certain of their creditors, and this was done without solicitation or any previous arrangement or agreement with said creditors, the latter being in fact mere passive participants in the transaction. *Held*, that the warrants of attorney and the assignment were but parts of the same transaction, and that they together constituted the assignment of the debtor's property within the meaning of the statute in relation to voluntary assignments for the benefit of creditors.

APPEAL from the Circuit Court of Cook county; the Hon. T. A. MORAN, Judge, presiding. Opinion filed February 17, 1886.

This was a bill in chancery brought by Jesse Spaulding to

rescind certain sales of lumber made by him to the firm of Hair & Odiorne, and to restrain proceedings under certain judgments by confession against said firm, and for a receiver.

On the 31st day of October, 1882, said firm of Hair & Odiorne, consisting of James A. Hair, Samuel G. Hair and William H. Odiorne, being largely indebted to the complainant and various other parties, and really insolvent, and it being apparent that, because of the approaching maturity of their outstanding obligations, their true financial condition could be no longer concealed, determined, after conference with their attorneys, to confess judgments in favor of certain of their creditors, whom they wished to prefer, and then make a general assignment for the benefit of their creditors. In pursuance of this plan, said firm caused to be drawn up judgment notes corresponding in dates and amounts with the notes and other commercial paper then held by the creditors whom they desired to prefer, and on November 1, 1882, in the early part of the day, a member of the firm, accompanied by one of their attorneys, visited said creditors and delivered said notes to them, merely saying that said notes were to take the place of the paper they then held, but giving them no other or further information in relation to the purposes of Hair & Odiorne in the premises. The creditors to whom said notes were delivered caused judgments to be immediately entered thereon against said firm, and executions to be issued on said judgments and placed in the hands of the proper officers.

Of said judgments, one in favor of the National Bank of Illinois for $34,943.69, was entered in the Circuit Court of the United States for the Northern District of Illinois; three were entered in the Superior Court of Cook county, viz., one in favor of John Farson for $20,000.79, one in favor of George W. Van Zandt for $13,913.58, and one in favor of David Vernon for $13,611.18; also one judgment in the Circuit Court of Cook county in favor of James Thomas for $4,805.36. Of these judgments, the one in favor of Farson was for the benefit of Preston & Kean, the one in favor of Van Zandt was for the benefit of Beveridge, Dewey & Van Zandt, the one in favor of Vernon was for the benefit of the Commercial National Bank,

and the one in favor of Thomas was for the benefit of L. A. Carton. All of these judgments were entered and executions issued between the hours of 11:30 A. M. and 2:05 P. M. At 2:45 P. M. of the same day, Hair & Odiorne executed and filed for record a general assignment to Milton R. Freshwaters for the benefit of their creditors. A second judgment in favor of the National Bank of Illinois for $4,638 was entered up in the Circuit Court of the United States on the following day and an execution issued thereon and placed in the hands of the marshal.

Under the executions from the United States Court, the marshal immediately levied upon and took possession of the stock of lumber belonging to Hair & Odiorne, and the sheriff shortly afterward indorsed upon the executions in his hands a levy upon the same property, subject to the levy made by the marshal. This bill was thereupon filed and a preliminary injunction issued, restraining the sheriff from selling said property under the executions in his hands. A similar bill was filed by the complainant in the Circuit Court of the United States, asking for an injunction restraining the marshal from selling under the executions in his hands, but that court refused to award an injunction, and the marshal proceeded to sell, and after satisfying his executions, turned over to the sheriff the residue of the property; and the marshal also subsequently paid over to the receiver appointed in this suit the sum of $5,992.39, being the cash surplus in his hands of the proceeds of the property sold by him. The National Bank of Illinois is not a party to this suit, and no question is made as to the validity of its judgments, and the sale thereunder is not in controversy.

The complainant, at the time of the execution of the assignment, was a large creditor of Hair & Odiorne for lumber sold and delivered to them, and claims both as a vendor seeking to rescind certain sales of lumber, and as a creditor. In his original bill he alleges that Freshwaters, the assignee, had not commenced any proceedings to set aside the judgments in the superior and circuit courts, and the levies thereunder, and to have the same declared void, and alleges his unwillingness so

to do.   Afterward Robert E. Jenkins was substituted for said
Freshwaters as assignee, and he was thereupon made a party
defendant, and he subsequently filed an answer and cross-bill,
seeking to have said judgments and executions set aside.

After the issues were made up, the court appointed a re-
ceiver to take the property in the hands of the sheriff and con-
vert the same into money, it being provided that the rights of
all claimants upon said property as they then existed, should
follow and attach upon the proceeds to the same extent as
upon the property itself, until the final disposition of the cause.
The receiver subsequently reported that he had disposed of all
of said property, realizing, after paying costs and expenses, the
sum of $60,401.76.   To this is to be added the $5,992.30 sub-
sequently received by him from the marshal.

During the progress of the litigation, the Commercial
National Bank effected some settlement with the complain-
ant, and the money supposed to represent the amount of its
judgment was withdrawn from the hands of the receiver by
an order of court, and paid over to the assignee, and the inter-
ests of the Commercial National Bank in this litigation were
thereupon ended.   The same thing was done in relation to
$9,722.55 of the judgment in favor of Beveridge, Dewey &
Van Zandt.   There remains, therefore, in the hands of the
receiver, about $42,000, and the residue of the claims under
said judgments not settled and adjusted amount to about
$30,000.

At the time of the transactions in question, the complain-
ant was a manufacturer of lumber, having a mill at Cedar
River, Michigan, and a business office in Chicago, and the
firm of Hair & Odiorne were lumber dealers in Chicago.
Hair & Odiorne had been dealing with the complainant for
several years, and during that time had purchased substan-
tially their entire stock of lumber of him.   Said purchases
were usually made on a credit of six months, and according to
their usual course of business, each cargo of lumber, on its
arrival, was inspected and the amount ascertained, and there-
upon Hair & Odiorne executed their promissory note to the
complainant therefor due six months after date.

It seems to have been usual with said parties, prior to each year's shipments of lumber, to make a special agreement, fixing the prices, the amount of lumber to be shipped to Hair & Odiorne during the season, etc., and accordingly, on the 5th day of May, 1882, the complainant submitted to them a proposition in writing, to sell them during the year 1882, 10,000,-000 feet of lumber of the average cut of said mill, at certain specified prices, and providing further that, if he should elect to let them have the entire cut of said mill, it should be at the same prices, and that they should take the entire cut of the mill if he wished them to do so. This proposition was on the same day accepted by Hair & Odiorne, and the complainant proceeded to deliver them lumber under it. The aggregate amount of lumber sold and delivered by the complainant to Hair & Odiorne between the date of said contract and October 31, 1882, was 15,700,514 feet, besides a large amount of lath and pickets. Some question was made at the hearing as to whether all of said lumber was delivered under the contract of May 5, 1882, or whether the portion of it in excess of 10,000,000 feet was delivered under a subsequent arrangement.

On the 31st day of October, 1882, Hair & Odiorne had become indebted to the complainant on notes thus given to him for lumber, to the amount of $236,603.81, and also for two cargoes of lumber then recently received, amounting to $10,629.08, making a total indebtedness of $247,322.89.

The complainant, during the course of his dealings with Hair & Odiorne, had required of them, at different intervals, statements of their financial condition, showing the amount of their assets and liabilities, and his dealings with them were, as is claimed, based upon and entered into in reliance upon the truth of said statements. There is no complaint of the accuracy and truthfulness of the statements made prior to the year 1882. Three were made during that year, viz., February 1st, April 1st and June 1st, from which a large amount of indebtedness from Hair & Odiorne to parties other than the complainant was omitted. Of these statements, the first showed an excess of assets over liabilities of $62,871.50, the

second of $62,918, and the third, though purporting to estimate the indebtedness without accurately figuring it, indicated about the same result. The evidence shows that, at the time these statements were made, the omitted indebtedness largely exceeded the amount of said balances, and that Hair & Odiorne were in fact owing much more than they had the means or ability to pay.

There is considerable conflict in the evidence as to the purposes for which these statements were required and the circumstances under which they were given, especially that of February 1st. The complainant's evidence tends to show that at the time that statement was made, negotiations were pending for the sale to Hair & Odiorne, of their lumber for the season of 1882, and that the contract subsequently made was entered into by him in reliance upon its truthfulness. The evidence on behalf of Hair & Odiorne, on the other hand, tends to show that when that statement was made, no negotiations of the character above mentioned were pending; that at that time a large amount of the notes given by them to the complainant in 1881, for lumber, were unpaid, and that they applied to the complainant for an extension, in accordance with a previous agreement on that subject; that the complainant, before he would consent to extend said notes, required of them a statement of their assets and liabilities, so that he could use it if necessary at the Commercial National Bank; that they protested against giving any statement, on the ground that the complainant had already bound himself by contract to grant them the extension desired; that they asked him what sort of a statement he wanted, and that he replied: "Put down what stock you have on hand and what you owe the Chicago yards, and what you owe me, and strike a balance." That they made a statement of that character and delivered it to the complainant, accompanying it with a letter in which they protested against his requiring any statement, claiming that his doing so was a violation of his contract, and informed him that to prepare the statement in time to secure a renewal of the notes, they were compelled to hastily estimate their stock of lumber as well as the other matters therein contained; that it was not

a complete statement of either their assets or liabilities, and that they were using their credit outside of their trade with the complainant, and were making outside loans in order to relieve the complainant by paying off his notes. The complainant's evidence tends to show that said letter was never received by him, and that Hair & Odiorne's account of the circumstances under which said statement was made is untrue.

The cause was heard on pleadings and proofs, and a decree entered by which the court found, among other things, that the letter above mentioned was not delivered to or received by the complainant; that the statement of February 1, 1882, was false and fraudulent, and was delivered by Hair & Odiorne to the complainant with intent to deceive him in relation to the safety of continuing to renew their paper and of continuing to make contracts with them, and to fraudulently induce him to renew said notes if called upon to do so, and to sell them lumber for the season of 1882; and that the complainant relied upon said statement and believed it to be true; that the statement of April 1, 1882, was also false and fraudulent and was made for like purpose; that in entering into the contract of May 5, 1882, the complainant relied upon both of said statements, but that he was so put on inquiry as to the financial condition of Hair & Odiorne, as to render himself chargeable with negligence in the premises as to the defendants; that on or shortly prior to June 1, 1882, Hair & Odiorne applied to the complainant to increase the amount of lumber to be delivered under the contract of May 5, 1882, from 10,000,000 to 12,000,000 feet, and delivered to him the statement of their assets and liabilities of June 1, 1882; that said statement was false and fraudulent and known to be such by Hair & Odiorne, and that the complainant relied upon its truth, and caused to be delivered, to Hair & Odiorne lumber which, with that already delivered, aggregated 12,127,645 feet, the last cargo of said lumber being delivered September 25, 1882; that afterward Hair & Odiorne claimed and insisted that the complainant had agreed to sell and deliver to them 14,000,000 instead of 12,000,000 feet of lumber, and that the complainant, although denying having made such an agreement, yet relying upon said state-

ments, delivered to Hair & Odiorne five additional cargoes of lumber, the last of which was delivered October 11, 1882, making the aggregate 14,072,285 feet; that afterward the complainant, relying upon said statements, at the request of Hair & Odiorne, delivered to them, upon the same terms as previously agreed upon, five more cargoes of lumber, the last being delivered October 31, 1882, making an aggregate of 15,700,514 feet; that at and prior to the date of their claims that the complainant had agreed to sell and deliver to them 14,000,000 feet of lumber, they well knew that their liabilities largely exceeded their assets, and that they would be unable to meet their liabilities as they matured, and would not be able to pay the complainant for the lumber thereafter delivered to them, and that all the lumber received by them on or after September 30, 1882, was received by them with the knowledge and expectation that they would not pay the complainant therefor, and in contemplation of their insolvency and with the intention of not paying the complainant therefor, and that, as to such lumber, the complainant was entitled, and at the time of filing his bill had elected, to rescind said sales, and have said lumber returned to him.

The court further found that said judgments by confession in the Circuit and Superior Courts of Cook county, were in fraud of the law prohibiting preferences in assignments for the benefit of creditors, and should be decreed fraudulent and void; and it was thereupon decreed that the lumber delivered by the complainant to Hair & Odiorne on or after September 30, 1882, be rescinded and the title of the complainant to said lumber established, and that so much of the money in the hands of the receiver as was realized from the sale of said lumber, in equity belonged to the complainant, and the amount of said money being found to be $11,198.32, it was ordered that the receiver pay the same to the complainant, and that he pay the residue of the moneys in his hands to the assignee of Hair & Odiorne. From this decree the said judgment creditors have appealed to this court.

Mr. W. H. SWIFT, Messrs. C. H. & C. B. WOOD, Mr. EDWIN F. BAYLEY and Messrs. JONES & JONES, for appellants.

Messrs. DEXTER, HERRICK & ALLEN, Mr. MELVILLE W. FUL-
LER, and Messrs. JENKINS & HARKNESS, for appellees.

BAILEY, P. J. In this case the question is presented, *in
limine*, whether the court below had jurisdiction, either under
the original bill or the cross-bill, to grant the relief prayed
for. Spaulding, the complainant in the original bill, seeks
relief in two different forms, and dependent upon different
principles. First, as to a portion of his transactions with Hair
& Odiorne, he files his bill as a vendor, to obtain a rescission
of the contract of sale for fraud, and a restoration to him of
the property sold. As to the residue of said transactions, he
assumes the attitude of a creditor, seeking to have certain
preferences in favor of other creditors of Hair & Odiorne
declared to be unlawful and void, and the property or fund
thus disposed of surrendered to the assignee under the gen-
eral assignment for the benefit of creditors.

In support of his right to the relief last mentioned, Spauld-
ing alleges a refusal by the assignee to interpose in his own
behalf, or to take any steps to assert his title to the property
now sought to be reclaimed from the preferred creditors.
The original assignee, however, having been removed, his
successor in trust subsequently appeared and filed his cross-bill,
making substantially the same allegations in relation to said
preferences as are made in the original bill, and claiming the
property taken by the preferred creditors as a part of the
estate vested in him by the assignment.

The jurisdiction of courts of equity to decree the rescission
of contracts for fraud, and to administer those remedies which
are dependent upon such rescission, is well established. Pom-
eroy's Eq. Juris., §§ 110, 112. So far, then, as the bill seeks
to obtain relief of that character, there can be no question as
to the jurisdiction of the court.

Upon the other branch of the case, it is urged that Spauld-
ing, not having exhausted his legal remedy by obtaining judg-
ment and having execution returned unsatisfied, is in no posi-

tion to assail or call in question any disposition his debtors may have made of their property. The rule is, that before a creditor can maintain a creditor's bill, or a bill in the nature of a creditor's bill, for the purpose of reaching property fraudulently conveyed or disposed of by his debtor, and subjecting it to the payment of his debt, he must exhaust his legal remedy. This, however, is not a bill of that character. Hair & Odiorne, by their general assignment, created a trust in favor of their creditors, and Spaulding, one of the beneficiaries, after the neglect and refusal of the trustee to institute proper proceedings for the protection of the trust property, brought the bill for that purpose in his own behalf. We see no ground of objection upon principle to the maintenance of such bill, and the authorities cited by the counsel for the appellees seem to sustain the jurisdiction of equity in cases of this character.

But it is said that under the statute in relation to voluntary assignments for the benefit of creditors, full and exclusive jurisdiction of all matters pertaining to the property assigned is vested in the county court. Since the decisions of the Supreme Court in Freydendall v. Baldwin, 103 Ill. 325, and Hanchett v. Waterbury, 17 Chicago Legal News, 412, the rule must be regarded as settled, that, in cases of voluntary assignments, the county court has exclusive jurisdiction to control, administer upon and distribute the trust estate, as well as to control the assignee in the performance of the duties of his trust. But, in our opinion, it does not follow, either from the rules of law established by those decisions or from any provision we are able to find in the statute itself, that the assignee, in his efforts to get the trust fund into his possession, and to subject it to the administrative jurisdiction of the county court, is necessarily confined to suits and proceedings in that court. A rule limiting him to that exclusive forum, would manifestly result in great and often in insurmountable difficulties. It may well be questioned whether the county court, with a common law jurisdiction limited in amount to $1,000, and with no chancery jurisdiction, could entertain suits at law on behalf of the assignee to recover more than $1,000, or suits in chancery of

Preston v. Spaulding.

any character. We find no provision in the statute conferring such jurisdiction. But even if there were, it is difficult to see how parties residing beyond the reach of its process could be sued at all.

Jurisdiction of the administration of estates is vested by statute in the county courts, and such jurisdiction may be said to be practically exclusive, but it has never been held that an executor or administrator might not, in collecting the estate, or in litigating adverse claims, bring suit in any court of competent jurisdiction. The right of executors and administrators to resort for these purposes to other judicial tribunals has never been questioned, nor has it been supposed that their doing so trenched in the least upon the exclusive jurisdiction of county courts over the administration of the estates. In Hanchett v. Waterbury, it is held that county courts, in exercising the jurisdiction conferred by the statute in relation to voluntary assignments, are closely analogous to courts of bankruptcy, and governed by substantially the same principles; but it is well known that although exclusive jurisdiction in cases of bankruptcy was vested in the district courts of the United States, yet jurisdiction of suits brought by assignees in bankruptcy in other courts, both State and Federal, has been uniformly sustained.

The eleventh section of the statute in relation to voluntary assignments, expressly authorizes assignees to sue for and recover in their own names, everything belonging or appertaining to the estates assigned. It can scarcely be doubted that the legislative intention here expressed is, to give assignees the right to institute suits in their own names in any court of competent jurisdiction, for the recovery of any portion of the estate vested in them by the assignment. Such suits are not in derogation of the jurisdiction of the county court, but ancillary to it. We are of the opinion, therefore, that the circuit court, sitting as a court of chancery, had jurisdiction of the bill and cross-bill in this case.

Is the decree warranted by the evidence? Let us first consider that branch of the case which relates to the question of rescission. Spaulding, in the original bill, prays for a decree

rescinding the sale of all the lumber delivered subsequent to the date of the contract of May 5, 1882. This relief was denied except as to the lumber delivered on or subsequent to September 30, 1882. As to that portion of the lumber sold, a rescission was decreed, and the receiver was ordered to pay over to Spaulding the proceeds of so much of the lumber delivered on or subsequent to September 30, 1882, as came to the hands of the sheriff. The rescission, so far as it is granted by the decree, is assigned for error by the defendants, and the refusal of the court to decree a rescission to the extent prayed for in the bill is assigned for error by Spaulding, he having filed cross-errors.

Spaulding claims the right to rescind the contract of May 5, 1882, on account of false and fraudulent representations made by Hair & Odiorne to him, prior to that time, in relation to their financial condition and circumstances. The representations made by Hair & Odiorne prior to the execution of the contract are contained in the statements of their assets and liabilities made by them to Spaulding February 1, 1882, and April 1, 1882. These statements, so far as they relate to the debts and liabilities of Hair & Odiorne, disclose no indebtedness beyond that owing to Spaulding, except that the February statement mentions a small sum due other lumber yards. That they were owing large sums of money to other parties for borrowed money at the time these statements were made seems to be conceded, and to that extent the statements were unquestionably false.

The evidence of the circumstances under which these statements, especially the one of February 1st, were made, is conflicting. Spaulding gave evidence tending to show that he had no notice or information in relation to the omitted indebtedness, but supposed that said statements made a true and complete disclosure of the assets and liabilities of Hair & Odiorne, and that he believed and relied upon them as such. The evidence adduced by the defendants tended to show, on the other hand, that the statement of February 1st was accompanied by a letter from Hair & Odiorne expressly notifying Spaulding that it was only a partial statement of their

indebtedness, and that they had been borrowing money from other parties, and also, that Spaulding, at the time both statements were made, had notice from other sources that they had incurred and were incurring liabilities to other parties for borrowed money. Without attempting to review the evidence on these questions in detail, it will be sufficient to say that, in our opinion, it fairly warranted the conclusion to which the court below seems to have arrived, viz., that the delivery of said letter to Spaulding at the time of the making of the February statement was not proved, but that at the time the contract was made, Spaulding had notice that Hair & Odiorne were borrowing money of other parties to some extent.

It may well be doubted whether, under the circumstances, Spaulding would have been authorized to rescind the contract, even if he had acted promptly. Having notice that Hair & Odiorne were borrowing money at one or more of the banks, the most ordinary prudence would have prompted him to make inquiries upon that subject and ascertain the extent of the liabilities thus incurred, before entering into a contract to sell and deliver to them wholly on credit, nearly $200,000 worth of lumber.

The relations between these parties were exceptional. For several years prior to the execution of said contract, Spaulding had been a large manufacturer of lumber. Hair & Odiorne, though possessed of relatively a very limited capital, had, during that time, been extensively engaged in the lumber trade, their entire stock of lumber, substantially, being furnished them by Spaulding on credit, the same constituting, at least, much the larger portion of the product of Spaulding's mills. The term of the credit was sufficiently long, as the parties seem to have contemplated, to enable Hair & Odiorne to sell the lumber and convert it into cash, before their payments to Spaulding should become due. In form, Hair & Odiorne were purchasers of Spaulding's lumber. In substance their relations to him had features bearing a strong resemblance to that of brokers employed by him to dispose of the product of his mills in the Chicago market.

It is clear that Spaulding was all the time in a position

where it was not only his right but his duty to keep himself fully informed of the pecuniary circumstances of Hair & Odiorne. His relations to them were such as would have justified him at any time in addressing to them the most searching and minute inquiries. His own interests were so largely involved in the question of their solvency that he could not, without the imputation of negligence, omit to investigate any fact coming to his knowledge having an apparent bearing upon that subject. Beyond this we think that, under the peculiar circumstances of the case, he owed a like duty to the commercial public, who were likely to be induced to trust Hair & Odiorne on the faith of the apparent ownership of the lumber put into their possession by him.

But even if Spaulding originally had a right to rescind said contract, such right, at least as against creditors, was lost by his negligence in failing to acquaint himself seasonably with the facts in relation to Hair & Odiorne's indebtedness. Beyond receiving from them an incomplete statement of their assets and liabilities on the first day of June, he is not shown to have used the slightest diligence, or to have made the slightest effort to ascertain their financial condition until their failure. At that time their indebtedness for borrowed money exceeded $90,000, of which nearly $14,000 was borrowed from the bank at which Spaulding usually did his banking business. His whole conduct evinced a most extraordinary confidence in Hair & Odiorne, and a singular omission of that care and vigilance which ordinary business prudence would dictate. Under these circumstances he is hardly in a position to invoke the aid of equity to cancel his contract and restore to him the property delivered under it.

As to the lumber delivered on or after September 30, 1882, the facts are different and call for the application of different rules. That lumber, in the first place, does not appear to have been delivered under the contract of May 5, 1882. Had it been a part of the lumber embraced in that contract, the right to rescind would be determined by the state of things at the time the contract was entered into, and would not be affected by the subsequent turn of events, except so far as such events

might tend to show that there was no ground for rescission. Bigelow on Frauds, 406. By the contract of May 5, 1882, Spaulding agreed to sell and deliver to Hair & Odiorne 10,000,000 feet of lumber, but reserved an option, which he had a right to exercise or not, as he pleased, to deliver, in addition to that amount, the residue of his product for the season. The last cargo delivered prior to September 30th, completed an aggregate of over 12,000,000 feet. At that time Spaulding was under no contract obligation to deliver any more. His original contract was more than filled ; and although Hair & Odiorne then claimed and insisted that he had agreed to deliver to them a larger amount, no such agreement is shown by the evidence. At their solicitation, however, Spaulding, while denying that he had previously agreed so to do, did deliver to them ten cargoes of lumber during the month of October. It follows from the rule above stated, that Spaulding's right to a rescission of the October sales must depend upon the facts as they existed at the time he agreed to make them.

The evidence shows that as early as September 30th, and perhaps earlier, Hair & Odiorne had become aware of their inevitable insolvency, and began to adjust their affairs with reference to that event. In doing so, they commenced about the last of September to pay, in money and property, various debts owing to their relatives and personal friends, and that being accomplished, their entire and disastrous failure speedily followed. The facts scarcely leave room for doubt, that when they applied to Spaulding for the lumber delivered to them in October, they were fully aware that they were insolvent, and could have no expectation of paying for said lumber, and so formed the plan of getting the lumber into their possession with a preconceived intention of not paying for it, but of cheating Spaulding out of it. These facts gave Spaulding a clear right of rescission, and as he elected to rescind in due time after becoming aware of the fraud, we think the rescission was properly decreed.

It remains to consider that portion of the decree which relates to the lien of the judgments by confession. The evi-

dence is undisputed that the warrants of attorney, by virtue of which said judgments were confessed, were executed by Hair & Odiorne without solicitation by the creditors to whom they were given, and without any previous agreement or arrangement with them, said creditors being in fact mere. passive participants in the transaction. No intimation of any kind was given to them of Hair & Odiorne's intention to execute to them said warrants of attorney until a member of that firm, accompanied by one of his attorneys, presented himself at their respective business offices on the morning of November 1, 1882, and delivered to them said instruments, merely saying that they were to take the place of the paper said creditors then held against said firm, but with no other comment or explanation. The evidence also shows beyond controversy that the execution of the warrants of attorney was a part of a plan previously determined. upon by Hair & Odiorne to dispose of all their property for the benefit of their creditors, and to give preference in so doing to the creditors named in the warrants, and that said plan was, on the same day and but a few minutes after the last of said judgments had been entered up, fully carried out by the execution by Hair & Odiorne of a voluntary assignment under the statute.

Under these circumstances, it is consonant both with reason and authority to hold that the warrants of attorney and the assignment were but parts of the same transaction; and that they together constituted the assignment of the debtor's property within the meaning of the statute in relation to voluntary assignments for the benefit of creditors. Berry v. Cutts, 42 Maine, 445; Perry v. Holden, 22 Pick. 269; Holt v. Bancroft, 30 Ala. 193; Van Patten v. Barr, 52 Iowa, 518; Livermore v. McNair, 34 N. J. Eq. 478; Kellogg v. Root, 23 Fed. Rep. 525; Hahn v. Salmon, 20 Id. 801; U. S. v. Griswold, 8 Id. 496; Doggett v. Herman, 5 McCrary, 269; Burrows v. Lehndorff, 8 Iowa, 96. As said by Chief Justice Shaw in Perry v. Holden, *supra*, "Instruments made at the same time, between the same parties, to accomplish one and the same object, shall be construed and taken together as one transaction, and the same is held as to deeds between different parties."

The rule is well stated by the Supreme Court of Maine in Berry v. Cutts, *supra*, as follows: "When a debtor, in contemplation of an assignment under the act, shall determine upon a distribution of his estate among his creditors, and in execution of such contemplated assignment and determination, and for the purpose of giving a preference to one class of creditors over another class, shall transfer to such preferred class distinct portions of his estate, and then assign the residue thereof to his general creditors, though the different instruments may not bear the same date or be executed at the same point of time, if they are executed in pursuance of an original design contemplated and determined upon in the beginning, they will be deemed in law one transaction, a transaction consisting of a series of acts intended to produce one result, to wit, the distribution of the debtor's estate among his creditors."

It is strenuously insisted, however, that before the rights of these judgment creditors can be affected by the subsequent execution by Hair & Odiorne of the assignment, it should be shown that they knew or were chargeable with notice of the fraudulent intention on the part of Hair & Odiorne to evade the provision of the statute. We have considered with attention the very able argument presented by the counsel for the appellants in support of this proposition, but are unable to adopt their conclusions as applicable to the facts in this case. Had the warrants of attorney been executed in pursuance of a previous contract with said creditors, or if they had been executed at their instance and on their application, so as to have rendered them in any proper sense moving parties in the transaction, it may well be doubted whether the rights thus acquired by them could be affected by any secret intention on the part of their debtors, of which they had no notice, and in which they did not participate. Here, however, they were merely passive. The execution of the warrants of attorney was the mere voluntary, unsolicited act of their debtors, and we are unable to see that their position, in the view of a court of equity, should be held to be at all different from what it would have been, if the preference had been embodied in the assignment itself.

This view was adopted by the Circuit Court of the United States for the Western District of Michigan, in Kellogg v. Root, *supra*. In that case an insolvent debtor, at his own instance, gave certain of his creditors security by way of a mortgage, and shortly afterward made an assignment, the circumstances justifying the inference that the mortgage and assignment were executed in pursuance of the same plan so as to be deemed in law but one transaction. The court, in holding the preference to be void, discusses the question under consideration here as follows: "It does not change the views expressed that the mortgagees had no notice or knowledge of the contemplated assignment at the time the mortgages were signed or placed on file, for the reason that they were not actors or participants in the giving of the instrument of security. They were intended as preferences by the only party who had to do with their creation, or who had any intention concerning them, and this party's purpose then and there was to give preferences by means of the mortgages, and follow them by a general assignment in the near future. They were fraudulent and void at their inception as against other creditors and could not be thereafter delivered as valid instruments. \* \* \* The case at bar was not one where a diligent creditor was present and pressing for security from his insolvent debtor. I do not question, in view of the decisions of the Supreme Court of Michigan, the right of a creditor to take security by mortgage or otherwise from his insolvent debtor, with knowledge of his financial weakness, so long as the creditor has no notice or knowledge that the debtor contemplates making an assignment; but the security must be given at the instance of the creditor, be duly delivered, and he must have no notice or knowledge of any fraudulent purpose, within the meaning of the statute."

Among the numerous authorities cited by counsel, we are able to find none which, when properly understood, is in conflict with the views above expressed. We have neither the time nor space to notice said authorities in detail, but we find none, where the preference is the voluntary, unsolicited act of the debtor, in which it is held that in order to defeat the

preference, it is necessary to prove knowledge or notice to the preferred creditor of the intention on the part of his debtor to create such preference in violation of the statute.

The thirteenth section of the statute in relation to voluntary assignments for the benefit of creditors, declares that every provision of any assignment for the payment of one debt or liability in preference to another shall be void, and that all debts and liabilities within the provisions of the assignment, shall be paid *pro rata* from the assets assigned. It follows that the warrants of attorney and the judgments entered thereon are void by force of the statute, and that all the estate of the debtors, including that seized under said judgments and the executions issued thereon, passed by the assignment to the assignee. The conclusions we have thus reached are in entire harmony with the decree of the court below, and said decree will accordingly be affirmed.

Decree affirmed.